## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------ x
                                            :

In re                                 :         **Chapter 11**

                                            :

**24 HOUR FITNESS**               :         **Case No. 20–11558**

**WORLDWIDE, INC.**, *et al.*,    :

                                            :

                         **Debtors.**[1]    :         **(Joint Administration Requested)**

                                            :

------------------------------------------------------------ x

## DECLARATION OF DANIEL HUGO IN SUPPORT
## OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

       I, Daniel Hugo, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

### Introduction

       1.      I am the Chief Restructuring Officer of 24 Hour Fitness Worldwide, Inc. ("**24 Hour Worldwide**") and each of its debtor affiliates in the above-captioned chapter 11 cases (together with 24 Hour Worldwide, the "**Debtors**" or "**24 Hour Fitness**"). Prior to my appointment as Chief Restructuring Officer, I provided financial advisory services to the Debtors in connection with my role as a Senior Managing Director at FTI Consulting, Inc. ("**FTI**"), proposed financial advisor to the Debtors. Since commencing work for the Debtors in March 2020, together with the FTI team, I have been personally involved with the Debtors' business and operations and their restructuring process. Accordingly, I have acquired significant

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are 24 Hour Holdings II LLC (N/A); 24 Hour Fitness Worldwide, Inc. (5690); 24 Hour Fitness United States, Inc. (8376); 24 Hour Fitness USA, Inc. (9899); 24 Hour Fitness Holdings LLC (8902); 24 San Francisco LLC (3542); 24 New York LLC (7033); 24 Denver LLC (6644); RS FIT Holdings LLC (3064); RS FIT CA LLC (7007); and RS FIT NW LLC (9372). The Debtors' corporate headquarters and service address is 12647 Alcosta Blvd., Suite 500, San Ramon, CA 94583.

knowledge of the Debtors, their business, and the circumstances that led to the commencement of these chapter 11 cases, as well as the Debtors' financial affairs, capital structure, operations, and related matters.

2.      I have held the position of Senior Managing Director at FTI since January 2018.  Prior to that time, I held positions within FTI's Turnaround and Restructuring Services practice as Managing Director (April 2015–January 2018), Senior Director (April 2014–April 2015), Director (April 2011–April 2014), and Senior Consultant (January 2009–April 2011). During the more than eleven (11) years that I have spent with FTI, I have led or otherwise been actively involved in the restructuring or reorganization of companies with annual revenues between $400 million and as much as $17 billion, including Frontier Communications Corporation; Claire's Stores, Inc.; DACCO Transmission Parts (NY), Inc.; RG Steel, LLC; Archbrook Laguna LLC; Hines Horticulture, Inc.; Canwest Global Communications Corp.; BHM Technologies Holdings, Inc.; Transportation Management Services, Inc.; Bally Total Fitness Corporation; and Terra Construction Inc.  In addition, I have served in numerous interim management roles for various companies.  I received a Bachelor of Business of Administration from Western Illinois University and a Master of Business Administration from DePaul University.  Additionally, I am a Certified Turnaround Professional, a designation issued by the Turnaround Management Association.

3.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  As set forth above, I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, books and records, and the circumstances that led to the commencement of these chapter

2

11 cases.  If called upon to testify, I would testify competently to the facts set forth in this declaration (the "**Declaration**") on that basis.

4.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of, or advisors to, the Debtors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.

5.     The Debtors have requested a variety of relief in their "first day" motions and applications (collectively, the "**First Day Motions**") filed concurrently herewith to minimize the adverse effects of the commencement of these chapter 11 cases.  I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary for the Debtors to smoothly transition into chapter 11.  I further believe that the relief requested in the First Day Motions is necessary to preserve and maximize the value of the Debtors' estates, to the benefit of all stakeholders.

6.     This Declaration is organized in six (6) parts.  **Section I** provides an overview of the Debtors and these chapter 11 cases.  **Section II** describes the Debtors' business, both in terms of the Debtors' history as well as the Debtors' current operations.  **Section III** describes the Debtors' corporate and capital structure.  **Section IV** describes the circumstances that led to the commencement of these chapter 11 cases.  **Section V** describes the various prepetition restructuring efforts undertaken by the Debtors.  **Section VI** summarizes the First Day Motions and the factual bases for the relief requested therein, including establishing why the interim relief requested by the DIP Motion (as defined herein) is necessary to avoid immediate and irreparable harm to these chapter 11 estates.

WEIL:\97517517\1\78028.0003

# I.
## Preliminary Statement

7.      But for the COVID-19 pandemic and its detrimental effects on their business, the Debtors would not be seeking the Court's protection today.  As described more fully below, the Debtors were required to close all of their fitness club locations nationwide on March 16, 2020, in accordance with governmental regulations and recommendations, and the vast majority of the Debtors' fitness clubs remain closed today.  Put simply, the COVID-19 pandemic upended the Debtors' operating model, leaving the Debtors without a source of revenue to fund their operations.  With the protection of this Court and the tools that chapter 11 provides, however, the Debtors are confident that they not only can endure the crisis that COVID-19 has presented, but also can transform and modernize their business model in a way that leads to long-term success and relevancy for the *24 Hour Fitness* brand and enhances the fitness experience of their millions of loyal members.

8.      24 Hour Fitness is one of the nation's leading operators of health and fitness clubs.  The Debtors operate out of their two headquarter locations in San Ramon, California, and Carlsbad, California.  As of March 31, 2020, the Debtors served approximately 3.4 million members in 445 locations across the United States, all of which are leased.  As detailed below, the Debtors' balance sheet also includes approximately $1.4 billion of funded debt, consisting of approximately $930.3 million in principal amounts outstanding under their Prepetition Credit Facility and $500.0 million in principal amount of unsecured bond debt, as well as substantial rental expense associated with the Debtors' club fleet.

9.      The Debtors generate revenue primarily through various club membership fees and the sale of related goods and services such as fitness apparel, food and beverage concessions, and personal training sessions.  In 2019, 24 Hour Fitness generated revenue and

4

Adjusted EBITDA performance of $1.5 billion and $191 million, respectively. As a general matter, 24 Hour Fitness has benefitted from overall growth in the health and wellness sector in the United States.

10.     However, a number of operational missteps in prior years, particularly with respect to transitioning the Debtors' then-current selling and operating model, negatively impacted financial performance. The Debtors responded proactively by, among other things, appointing a new management team commencing in January 2019 that sought to aggressively respond to these challenges. Under new leadership, the Debtors began implementing a number of operational and strategic initiatives to drive new-member growth, streamline their product platform, and position the 24 Hour Fitness brand for sustainable, long-term success. The Debtors already were beginning to see early encouraging signs of these changes prior to the unprecedented impact of COVID-19.

11.     Unfortunately, the Debtors' transformational strategy, and their operations as a whole, have been materially disrupted by COVID-19. On March 16, 2020, the Debtors closed all their club locations in response to the recommendation of the Centers for Disease Control and Prevention (the "**CDC**") as well as various state and local laws, regulations, and/or governmental orders. As of that date, substantially all of Debtors' operations were hibernated, and monthly membership revenues were suspended on or about April 15, 2020, notwithstanding the temporary closure provisions set forth in the Debtors' various membership agreements. In short, the Debtors have not generated any material operating revenues for nearly two months.

12.     With their clubs shuttered, the Debtors have focused on identifying the steps necessary to rightsize their balance sheet and club footprint and on developing the strategic plan necessary to transform the business in light of these unprecedented challenges. The Debtors, with the assistance of Hilco Real Estate, LLC ("**Hilco**"), have already begun negotiations with their

WEIL:\97517517\1\78028.0003

landlords to facilitate the cost savings necessary to rightsize their go-forward club footprint, and the Debtors further expect to exit certain clubs during these chapter 11 cases.  Additionally, the Debtors have begun the process of re-opening their club locations as various "shelter in place" and similar orders have been lifted, although the Debtors remain intently focused on taking the best steps possible to provide for the health, safety, and well-being of their members and employees.  Further, the Debtors have begun undertaking various operational initiatives to enhance their operational profile.

13.     At the same time, the Debtors' liquidity is limited, and the Debtors are entering chapter 11 with less than $9 million cash on hand—and their re-opening process is in its early stages.  The Debtors, therefore, are determined to utilize the chapter 11 process to enhance liquidity through debtor-in-possession ("**DIP**") financing, to obtain the 'breathing spell' provided by chapter 11, and to use the bankruptcy toolkit to help rightsize their footprint and balance sheet.

14.     With respect to DIP financing, an ad hoc group of lenders under the Debtors' Prepetition Credit Facility and holders of the Debtors' Senior Unsecured Notes (each as defined herein) (the "**Ad Hoc Group**") has agreed to fully backstop a $250 million new-money senior secured debtor-in-possession facility (the "**DIP Facility**") to support these chapter 11 cases and the Debtors' reorganization efforts.  On information and belief, members of the Ad Hoc Group, hold approximately 63.3% of the aggregate principal amount outstanding under the Prepetition Credit Facility and approximately 73.9% of the face amount of the Senior Unsecured Notes (each as defined herein).  The Debtors further have engaged in productive discussions with the Ad Hoc Group around a holistic reorganization, and the Debtors expect these discussions will continue postpetition, with the goal of building consensus around a deleveraging transaction and filing a plan of reorganization in the near term.

WEIL:\97517517\1\78028.0003

15.     The process of revitalizing the Debtors' business has already begun.  As of the Petition Date, the Debtors already have reopened approximately twenty (20) of their fitness clubs in Texas, in accordance with the phased approach that certain state and local governments have implemented with respect to reopening businesses in the wake of the COVID-19 pandemic. The Debtors intend to continue this measured re-opening, with expectations to re-open the majority of their clubs by the end of June.  Throughout this careful process, the Debtors have taken an innovative approach to the reopening of their clubs, instituting market-leading strategies to keep their members and employees safe, including an app-based reservation system to ensure that their clubs remain in compliance with applicable social distancing guidelines, a touchless check-in system to limit members' and employees' contact with surfaces, and cleaning schedules that ensure that entire clubs are sanitized every hour.  The Debtors will continue to innovate and transform their business throughout the chapter 11 process and beyond, and, following their emergence from chapter 11 with a deleveraged balance sheet and a right-sized footprint, the Debtors will be well positioned for long-term success.

## II.
## The Debtors' Business

**A.     The Debtors' Business History**

16.     24 Hour Fitness was founded in 1983 with a single fitness club in San Leandro, California, operating under the name *Nautilus Health Spa*.  Over the next decade, as the Debtors expanded their footprint throughout California and beyond, *Nautilus Health Spa* rebranded as *24 Hour Nautilus* before eventually becoming *24 Hour Fitness*.  By 1996, the Debtors operated over 100 clubs in six (6) states, positioning them among the nation's largest operators of fitness clubs.  Following a series of acquisitions, by 2002, the Debtors had grown to serve over 3 million members and had reached $1 billion in annual revenue.  The Debtors continued expansion

WEIL:\97517517\1\78028.0003

thereafter, acquiring an additional thirty-two (32) clubs from Bally Total Fitness Holding Corporation and operating select club locations under the *BFit* brand.

## B. The Debtors' Operations

17. Prior to the March 2020 closure as a result of the COVID-19 pandemic, the Debtors operated in fourteen (14) states and the District of Columbia, with 445 clubs serving approximately 3.4 million members.[2] Although the Debtors operated select locations in Oregon under the *BFit* brand prior to the Petition Date, the Debtors will operate all of their clubs under the *24 Hour Fitness* brand on a go-forward basis.



The current *24 Hour Fitness*® logo.



A *24 Hour Fitness* location.

---

[2] Contemporaneously herewith, the Debtors filed the *Omnibus Motion of Debtors for Entry of Order (I) Authorizing Debtors to (A) Reject Certain Unexpired Leases of Nonresidential Real Property and (B) Abandon De Minimis Property in Connection Therewith and (II) Granting Related Relief* (the "**Lease Rejection Motion**"), pursuant to which the Debtors seek authority to reject a first wave of approximately 135 unexpired leases for fitness clubs in unprofitable markets and locations, which will not be part of the Debtors' go-forward club portfolio, as well as other leased sites.

18.     The Debtors' fitness clubs offer members a comprehensive fitness experience.  In addition to providing members with access to cardio and weightlifting equipment, the Debtors' fitness clubs feature a range of additional amenities and services, including personal training services, group exercise classes, and "Kids' Club" services.  Given the large size of the Debtors' clubs, which average approximately 36,000 square feet, certain clubs also feature, among other things, full-size basketball courts, lap pools, and "Turf Zones" for high-intensity interval training.



**A basketball court in a *24 Hour Fitness* location.**



**Aquatic facilities in a *24 Hour Fitness* location.**



A "Turf Zone" and cardio equipment in a *24 Hour Fitness* location.

19. The Debtors offer their members a comprehensive virtual fitness experience through their *24GO*® mobile app. Through the *24GO* app, members can, among other things, create customized fitness plans, view a library of video-based workouts from top content providers, connect with trainers, and schedule workouts and class sessions in the Debtors' fitness clubs. The *24GO* app has been an invaluable tool during the closure of the Debtors' fitness clubs as a result of the COVID-19 pandemic because it has enabled the Debtors to continue to serve and connect with their members even when their fitness clubs remained closed.



The *24GO*® mobile app.

20. The Debtors primarily generate revenue through the collection of membership dues and fees. Each member is party to a membership agreement, pursuant to which

WEIL:\97517517\1\78028.0003

membership dues generally are billed on a monthly or annual basis. The Debtors also generate revenue from the sale of a variety of products and services, including, among other things, personal training sessions, Kids' Club services, and retail merchandise.

21. Before implementing a reduction in force and a furlough program following the closure of the Debtors' fitness clubs in connection with the COVID-19 pandemic, the Debtors employed approximately 19,200 individuals. Due to the closure of their clubs in March 2020, the Debtors furloughed approximately 17,800 individuals and reduced their workforce by approximately 700 individuals. After evaluating their go-forward club footprint and implementing certain strategic initiatives, the Debtors further reduced their workforce by approximately 8,300 individuals prior to commencing these chapter 11 cases. As of the Petition Date, the Debtors employ approximately 10,200 individuals, including approximately 8,100 individuals who are employed on a part-time basis.

### III.
### The Debtors' Corporate and Capital Structure

**A.    Corporate and Capital Structure**

22. A chart summarizing the Debtors' capital and corporate organization structure, as of the date hereof, is annexed hereto as **Exhibit A**. As set forth on **Exhibit A**, each of the Debtors is a subsidiary of 24 Hour Holdings II, LLC ("**24 Holdings II**"), a limited liability company organized under Delaware law. 24 Holdings II is indirectly owned by affiliates of AEA Investors, Ontario Teachers' Pension Plan, and Fitness Capital Partners. The board of managers of 24 Holdings II has delegated decision-making authority with respect to this restructuring process to a special committee (the "**Special Committee**") of disinterested managers consisting of: (i) Mr. Marc Beilinson; (ii) Mr. Stephen Hare; and (iii) Mr. Roland Smith.

WEIL:\97517517\1\78028.0003

## B. Prepetition Capital Structure

23. As of the Petition Date, the Debtors' prepetition capital structure includes approximately $1.4 billion in funded debt. The Debtors' funded debt obligations (the "**Obligations**") are summarized below:[3]

| As of Petition Date:<br>Debt Instrument (Aggregate Principal) | Funded Debt<br>($ millions) |
|---|---|
| Prepetition Credit Facility (pari passu) | |
| *Revolving Credit Facility*[4] | $    95.2 |
| *Term Loan Facility* | 835.1 |
| **Total Secured Debt** | **930.3** |
| Senior Unsecured Notes | 500.0 |
| **Total Funded Debt** | **$ 1,430.3** |

24. *Prepetition Credit Facility.* On May 31, 2018, certain of the Debtors entered into that certain Credit Agreement, dated as of May 31, 2018 (as amended, restated, or supplemented from time to time, the "**Prepetition Credit Agreement**"), by and among 24 Hour Worldwide, as borrower, 24 Hour Holdings II, as Holdings (as defined therein), the Subsidiary Guarantors,[5] Morgan Stanley Senior Funding, Inc., as administrative agent and collateral agent (the "**Prepetition Agent**"), and the lenders party thereto (the "**Prepetition Lenders**" and, together with the Prepetition Agent, the "**Prepetition Secured Parties**"), pursuant to which the Prepetition Lenders agreed to provide 24 Hour Worldwide with (i) a revolving credit facility in an aggregate principal amount equal to $120,000,000 (the "**Revolving Credit Facility**") and (ii) a term loan facility in aggregate principal amount equal to $850,000,000 (the "**Term Loan Facility**" and together with the Revolving Credit Facility, the "**Prepetition Credit Facility**").

---

[3]    As detailed below, certain Debtors are not obligors with respect to the funded debt balances presented here.

[4]    This does not include obligations outstanding with respect to issuance of letters of credit totaling approximately $21.4 million.

[5]    As used herein, "**Subsidiary Guarantors**" refers to the following Debtors:  (i) 24 Hour Fitness United States, Inc.; (ii) 24 Hour Fitness USA, Inc.; (iii) 24 Hour Fitness Holdings LLC; and (iv) RS Fit Holdings LLC.

WEIL:\97517517\1\78028.0003

25. The Debtors' obligations under the Prepetition Credit Facility are unconditionally guaranteed by 24 Hour Holdings II and each of the Subsidiary Guarantors. All obligations under the Prepetition Credit Agreement, and the guarantees of those obligations, are secured by a first-priority security interest in the Collateral (as defined in the Prepetition Credit Agreement), which includes all or substantially all of the assets of the Debtors, subject to certain exceptions and permitted liens.

26. The Term Loan Facility matures in May 2025. As of the Petition Date, the aggregate principal amount outstanding under the Term Loan Facility is approximately $835.1 million. The Revolving Credit Facility matures in May 2023. As of the Petition Date, the aggregate principal amount outstanding under the Revolving Credit Facility is approximately $95.2 million. Additionally, as of the Petition Date, there are approximately $21.4 million in issued and outstanding letters of credit (the "**Letters of Credit**") under the Revolving Credit Facility.

27. *Senior Unsecured Notes.* 24 Hour Worldwide, as issuer, the Subsidiary Guarantors, as guarantors, and Wells Fargo Bank, National Association, as indenture trustee, are parties to that certain indenture, dated as of May 30, 2014 (as amended, restated, or supplemented from time to time, the "**Indenture**") governing the 8.000% senior unsecured notes due 2022 issued by 24 Hour Worldwide (the "**Senior Unsecured Notes**"). The Senior Unsecured Notes mature in June 2022. As of the Petition Date, the aggregate principal amount outstanding under the Unsecured Notes is approximately $500.0 million.

WEIL:\97517517\1\78028.0003

# IV.
## Circumstances Leading to Commencement of Chapter 11 Cases

### A.     COVID-19 Pandemic

28.     The impact of COVID-19 on the Debtors' business—and the fitness club industry as a whole—cannot be overstated. As noted above, the Debtors were obliged to close all of their fitness clubs nationwide on March 16, 2020, in response to this national emergency. As a result, the Debtors were no longer able to generate new sources of revenue (by winning new members) and, on or about April 15, 2020, the Debtors suspended billing on account of monthly membership dues.[6] Since that time, the Debtors have sought to defer or reduce expenses and husband liquidity as the Debtors have been effectively required to operate without any material revenues for nearly two months.

### B.     Operational Challenges from "EVO"

29.     In an effort to differentiate their offerings and build a platform to offer more relevant services to their members, the Debtors had begun implementing a series of strategic initiatives to transform their business model commencing in April 2017. These changes focused not only on the products and services that were sold, but also the method by which they were communicated and sold to members and prospective members.

30.     In particular, the Debtors began a pilot program known as the "Evolutionary Model," or "EVO," in an effort to enhance their sales model to appeal to the way consumers may prefer to purchase products and services today. This model was transitioned into all clubs by July 2019. This pilot resulted from a yearlong strategic review that the Debtors had conducted to better

---

[6]     To date, litigation has been commenced in connection with the Debtors' monthly billing on a post-March 16 basis, notwithstanding, among other things, the Debtors' rights under their various membership agreements. The Debtors reserve all rights, claims, and defenses in this regard.

understand their customers, competition, and best path for growth. Prior to the implementation of EVO, when prospective members entered a club and indicated their interest in joining a 24 Hour Fitness club, they were required to tour the fitness club with a member of the Debtors' sales team. All prospective members, no matter their stated goals or desires, were sold and communicated to the same way. Market feedback had indicated that prospective members found this sales model to be aggressive and out of step with current customer preferences. In response to this feedback, the Debtors piloted the EVO program, which replaced the Debtors' salesforce with self-service options so that prospective members could enroll at a 24 Hour Fitness location at their own pace. In addition, the sales offering itself was more tailored to the potential customers' stated goals and desires. EVO also was viewed as a cost-saving measure, insofar as it replaced certain sales positions within the Debtors' operating structure. However, the Debtors believe that the EVO model ultimately impaired their ability to convert potential members into actual dues-paying members.

31.     The Debtors responded thoughtfully and aggressively, including by engaging a largely new executive team in early 2019, as detailed below. As the Debtors' new management team further assessed the EVO program, the Debtors determined that the EVO sales model, as implemented, while strategically relevant to current consumer preferences, was missing critical elements to drive conversion of new prospects, thereby impacting new-member revenue. Since mid-2019, the Debtors, led by their new management team, systematically worked to mend the initial gaps in this model and improve the conversion statistics that had been so greatly impacted. Prior to COVID-19, the Debtors had already begun to realize positive developments and expected to see growth on a year-over-year basis again once the June 2019 implementation had been lapped. COVID-19, unfortunately, stopped these developments in their tracks..

**V.**
**Prepetition Restructuring Efforts**

**A.     Operational Initiatives**

32.     *New Executive Leadership Team and Strategic Initiatives.*  Prior to the closure of their fitness clubs in connection with the COVID-19 pandemic, the Debtors already had begun undertaking a number of steps to transform their business and to improve their operational performance.  Starting in early 2019, the Debtors' installed a new and highly experienced executive leadership team, including a new Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Chief Human Resources Officer, Senior Vice President of Strategy and Transformation, and Chief Communications Officer.  The Debtors' executive leadership team has already identified several key initiatives that will better position the Debtors for success, including (i) reintroducing an in-club salesforce to transition away from the EVO sales model; (ii) reducing the complexity of their membership types, pricing model, and club classifications; (iii) efficiently replicating on-trend concepts in the Debtors' fitness clubs; (iv) seeking partnerships with providers of on-trend concepts; and (v) undertaking a lease rationalization process to drive value.  By implementing these initiatives, the Debtors hope to both broaden the population of members and potential members and offer more products and services that their current members will purchase from them.

33.     *Workforce Rationalization.*  The Debtors have also taken steps to remove inefficiencies in their workforce.  Prior to commencing these chapter 11 cases, the Debtors significantly reduced their workforce, as a result of both permanent club closures and a strategic attempt to streamline their operating model.  Whereas the Debtors' previous operating model included certain positions that were focused solely on providing discrete services to club members, the Debtors' new, streamlined workforce will orient all of the Debtors' employees toward sales

capabilities, and all previously service-centric positions will now include a sales component. By implementing these adjustments, the Debtors believe that they can leverage the capabilities of all of their employees and drive growth in new-member conversions.

34. *Lease Rationalization.* The Debtors lease all of their club locations from approximately 300 different landlords. Following the closure of their fitness clubs as a result of the COVID-19 pandemic, the Debtors began to evaluate their lease portfolio to, among other things, quantify and realize the potential for lease savings. The Debtors, together with Hilco, began communicating with landlords in an effort to improve lease terms by agreement and address certain burdensome leases. Relatedly, the Debtors are requesting authority to reject approximately 135 club leases, as well as other leased sites, pursuant to the Lease Rejection Motion (as defined herein), filed contemporaneously herewith. In addition, the Debtors also have filed the Lease Rejection Procedures Motion (as defined herein), seeking authority to implement procedures to reject additional unexpired leases if the Debtors are unable to negotiate sufficient rent concessions to position those clubs for sustained future profitability.

35. *COVID-19 Reopening Initiatives.* The Debtors have taken a number of steps to ensure that their employees and members have confidence in the safety of their facilities as the Debtors begin to reopen their fitness clubs in certain locations. The Debtors have established a system of scheduled cleanings to ensure the safety of their employees and members: clubs are opened for sixty-minute workout sessions, after which the clubs are closed for a thirty-minute period to conduct a deep clean of the facility. Members may reserve a workout slot by utilizing the reservation feature on the *24GO* app, and upon arriving at clubs, members can utilize a touchless check-in system at the front desk. By establishing the app-based reservation system, the

WEIL:\97517517\1\78028.0003

Debtors can ensure that the occupancy of the gym complies with social distancing guidelines set by state and local governments.

36.     Additionally, the Debtors are utilizing space in their clubs in creative ways in order to continue to offer members a range of amenities and services.  For example, the Debtors are utilizing their basketball courts to hold group exercise classes, including by relocating stationary bike equipment to continue to offer indoor cycling classes, so that members and equipment can be properly spaced to comply with social distancing guidelines.



**A group exercise class held on a basketball court to ensure proper social distancing.**

These initiatives serve to protect the health and safety of the Debtors' employees and members and have been well received by the Debtors' membership base.

**B.      Creditor Engagement & Strategic Process**

37.     Prior to commencing these chapter 11 cases, the Debtors took a number of steps to address the challenges facing their businesses, including by seeking to optimize their balance sheet.  In early 2020, the Debtors engaged in preliminary discussions with certain creditors around potential balance sheet transactions; however, COVID-19 largely pre-empted these efforts. Further, in the wake of the COVID-19 shutdown, the Debtors proactively engaged with, among other stakeholders, members of the Ad Hoc Group given the clear challenges arising from this pandemic.

38.     This process of engagement has included, among other things, sharing substantial amounts of business and financial diligence, ongoing dialogue and engagement, and, of course, negotiations around incremental liquidity.  In this process, the Debtors have been represented by experienced legal and financial advisors, including FTI, Lazard Frères & Co. ("**Lazard**"), and Weil, Gotshal & Manges LLP, which process has been supervised by the Special Committee.  As a result, the Debtors negotiated a forbearance through June 18, 2020, in connection with their failure to deliver certain financial statements required under their Prepetition Credit Facility, and the Debtors elected to utilize the 30-day grace period arising under the Indenture on account of an interest payment otherwise due as of June 1, 2020, with respect to their Senior Unsecured Notes.

39.     Further, the Debtors, with the assistance of Lazard, commenced a process to engage with potential strategic and financial investors to determine whether parties outside the Debtors' capital structure could provide a value-maximizing alternative for the Debtors' stakeholders.  This process, too, has been undertaken under the supervision of the Special Committee.  The Debtors will continue to review whether such a postpetition process may be beneficial to their chapter 11 estates.

## C.     The Chapter 11 Filings & Next Steps

40.     The Debtors require a substantial amount of incremental capital to operate in the ordinary course, re-open their clubs, and, ultimately, implement successfully the operational initiatives described above.  As noted above, the Debtors have generated effectively no material revenue since mid-April 2020, and the capital required to re-open, enhance, and maintain the Debtors' clubs is substantial.  To that end, the Debtors, with the assistance of their advisors, engaged in good faith, arm's length negotiations with the Ad Hoc Group to provide incremental financing through the proposed DIP Facility.  This financing is vitally necessary given that the

WEIL:\97517517\1\78028.0003

Debtors have limited cash on hand and that the Debtors' club-opening process will be accelerating in the near term. Such liquidity will provide the Debtors with the time necessary to implement a right-sizing process around their club footprint and to engage with their stakeholders and, potentially, alternative strategic or financial partners, around the Debtors' ultimate reorganization and emergence from chapter 11 as quickly as reasonably possible.

**VI.**
**First Day Motions**

**A.     Overview of First Day Motions**

41.     Contemporaneously herewith, the Debtors have filed First Day Motions, which seek orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth reorganization. The First Day Motions include the following:

- *Motion of Debtors for Entry of Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix and Consolidated List of the Top Thirty Unsecured Creditors, (B) Redact Certain Personally Identifiable Information for Individual Creditors and Interest Holders, and (C) Omit Members and Guests from the Creditor Matrix, (II) Approving the Manner of Notifying Members and Guests of Commencement of Chapter 11 Cases, and (III) Granting Related Relief;*

- *Motion of Debtors for Entry of Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief;*

- *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Motion**");

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue Participating in Existing Cash Management*

20

*System and Using Bank Accounts and Business Forms, and (B) Continue Intercompany Transactions, (II) Providing Administrative Expense Priority for Postpetition Intercompany Claims, and (III) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs, and (B) Continue Compensation and Benefits Programs, and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Obligations to Critical Vendors and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Continue to Maintain Their Insurance Policies and Programs, (B) Continue to Maintain Their Surety Bond Program and (C) Honor All Insurance and Surety Obligations, (II) Modifying the Automatic Stay, and (III) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition Claims of (A) Shippers, Warehousemen, Lienholders, and (B) 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Undisputed and Outstanding Prepetition Orders, and (III) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices and (B) Honor Related Prepetition Obligations and (II) Granting Related Relief;*

- *Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service, (IV) Authorizing the Debtors to Honor Obligations to Payment Processors in the Ordinary Course of Business, and (V) Granting Related Relief;*

- *Motion of Debtors for Entry of Order (I) Approving Procedures for Rejecting Unexpired Leases of Nonresidential Real Property and (II) Granting Related Relief;*

- *Omnibus Motion of Debtors for Entry of Order (I) Authorizing Debtors to (A) Reject Certain Unexpired Leases of Nonresidential Real Property and (B) Abandon* De Minimis *Property in Connection Therewith and (II) Granting Related Relief*;

- *Motion of Debtors for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in, and Claims Against, the Debtors and (B) Claims of Certain Worthless Equity Deductions*; and

- *Application of Debtors for Appointment of Prime Clerk LLC as Claims and Noticing Agent* Nunc Pro Tunc *to the Petition Date*.

42.     The First Day Motions seek authority to, among other things, obtain postpetition financing, honor employee-related wages and benefits obligations, pay claims of certain vendors and suppliers critical to the Debtors' business operations, and ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these chapter 11 cases.[7] I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work toward a successful restructuring that will inure to the benefit of all of their stakeholders.

43.     Several of the First Day Motions request authority to pay certain prepetition claims against the Debtors.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay

---

[7]     Further, although not sought contemporaneously herewith, I have been advised that the Debtors intend request, pursuant to section 365(d)(3) of the Bankruptcy Code, authority to suspend certain payments to landlords on account of postpetition obligations that accrue under unexpired real property leases and related relief.

certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. The Debtors will defer seeking other relief to subsequent hearings before the Court.

44. I am familiar with the content and substance of each of the First Day Motions. I believe approval of the relief sought in each of the First Day Motions is critical to the Debtors' ability to successfully implement their chapter 11 strategy, with minimal disruption to their business operations. Obtaining the relief sought in the First Day Motions will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

## B. The Interim Relief Requested by the DIP Motion Is Necessary to Avoid Immediate and Irreparable Harm to the Debtors' Estates.[8]

45. As noted above, the Debtors commenced these Chapter 11 Cases as a direct result of the COVID-19 global pandemic. In March 2020, the Debtors closed all of their fitness clubs nationwide, in accordance with governmental regulations and recommendations, and the Debtors are now beginning the process of re-opening certain of their clubs in accordance with ongoing and evolving governmental regulations and recommendations. The closure of the Debtors' clubs has had a material impact on the Debtors' liquidity position, insofar as the Debtors have not generated any material cash flow from operations since April 2020.

46. As a result, the Debtors are commencing these Chapter 11 Cases with less than $10 million in cash on hand, and the Debtors do not anticipate generating any material cash flow during the near term period. And, while the Debtors have begun the process of re-opening certain club locations, such process remains in its initial stages and is a capital-intensive

---

[8] Capitalized terms used but not defined in this Section VI.B shall have the meanings set forth in the DIP Motion.

undertaking. For example, the Debtors' current Budget does not project that the Debtors will generate weekly receipts of more than $2 million until the week ended July 24, 2020. Further, the Debtors' total cash receipts are projected to be less than $2 million in the aggregate for the first four (4) weeks of these chapter 11 cases.

47. By comparison, the Debtors' immediate cash needs are substantial and are projected to increase over time. The Debtors' projected operating expenses are expected to total approximately $30 million over the first four (4) weeks of these chapter 11 cases. This total does not include expenses specifically arising from the commencement of these chapter 11 cases, such as payments contemplated under the First Day Motions, as well as professional fees and expenses.

48. After substantial consideration and analysis of the Debtors' cash needs with the Company's management team and the Debtors' advisors, I do not believe that the Debtors can operate their business without additional funding without also risking immediate and irreparable harm to their estates. Absent access to the proceeds of the DIP Financing and Cash Collateral, the Debtors could be forced to liquidate on a highly expedited basis because they otherwise lack the liquidity to fund ordinary-course operations and pay the administrative costs of these Chapter 11 Cases.

49. The Debtors require immediate access to the proceeds of the DIP Financing and access to Cash Collateral to (a) fund working capital requirements and other operational expenses in connection with the ordinary-course operation of the Debtors' business, including with respect to the process of re-opening their fitness clubs in a safe and responsible manner; (b) provide an appropriate liquidity cushion in light of the limited cash flow expected to be generated from operations in the near term; (c) send a strong market signal that these Chapter 11 Cases are well-funded, which is particularly important given potential member concerns regarding the Debtors'

restructuring efforts; and (d) stabilize the Debtors' business operations in support of the Debtors' restructuring efforts. I expect that vendors, members, and their employees will be highly focused on whether these chapter 11 cases are appropriately funded. I believe that vendors will be more comfortable continuing to do business with the Debtors, and employees and members will be more likely to remain with the Debtors, if their liquidity is improved as a result of the proposed DIP Financing.

50. I believe that the proposed DIP Facility, together with their proposed use of Cash Collateral, will provide the Debtors with the liquidity necessary to satisfy these needs. Absent authority to enter into and access the proceeds of the DIP Facility and to use Cash Collateral, even for a limited period of time, the Debtors will be unable to continue operating their businesses, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates. Accordingly, I believe the Debtors require access to their proposed DIP Financing, in addition to access to Cash Collateral, to finance their operations and maintain sufficient liquidity cushion to continue the process of bringing their clubs back into operation and to avoid immediate and irreparable harm to these estates.

51. Prior to the Petition Date, the Debtors, in consultation with their advisors, reviewed and analyzed the Debtors' projected cash needs and prepared the Initial Budget. I believe that the Initial Budget accurately projects the Debtors' funding requirements over the identified period and that such projections are reasonable and appropriate under the circumstances. At the same time, particularly given the impact of the COVID-19 pandemic, the Debtors' financial forecasting depends on a number of assumptions outside of the Debtors' control, including their ability to bring clubs back into operation in accordance with governmental regulations and recommendations, retain their existing membership base, and win new members. In light of these

unprecedented challenges, I believe that the liquidity provided by the Debtors' proposed DIP Financing, coupled with their proposed use of Cash Collateral, is essential to avoid material and irreparable harm to the Debtors' estates.

52.     In sum, I believe that, absent the interim and final relief requested by the DIP Motion, the Debtors will suffer significant, and potentially permanent, impairment to their business operations to the material detriment of their stakeholders. Under the circumstances, I believe that, through the proposed DIP Financing, the Debtors achieved the best outcome reasonably available to address the Debtors' liquidity needs and preserve value for all stakeholders.

[*remainder of page intentionally left blank*]

I declare under penalty of perjury that, after reasonable inquiry, the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: _____June 15_____, 2020
      Wilmington, Delaware

                         Daniel Hugo
                         Chief Restructuring Officer
                         24 Hour Fitness Worldwide, Inc. and its debtor affiliates