## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>24 HOUR FITNESS WORLDWIDE, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 20-11558 (KBO)<br><br>(Jointly Administered)<br><br>Hearing Date: July 14, 2020 at 11:00 a.m. (ET)<br>Objection Deadline: July 10, 2020 at 12:00p.m. (ET) (extended for Committee)<br><br>**Re: Docket No. 17** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

The official committee of unsecured creditors (the "Committee") of 24 Hour Fitness Worldwide, Inc. and its affiliated debtors and debtors-in-possession (the "Debtors"), by and through its proposed counsel, Cooley LLP and Morris James LLP, hereby files this objection (the "Objection") to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection to Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are 24 Hour Holdings II LLC (N/A); 24 Hour Fitness Worldwide, Inc. (5690); 24 Hour Fitness United States, Inc. (8376); 24 Hour Fitness USA, Inc. (9899); 24 Hour Fitness Holdings LLC (8902); 24 San Francisco LLC (3542); 24 New York LLC (7033); 24 Denver LLC (6644); RS FIT Holdings LLC (3064); RS FIT CA LLC (7007); and RS FIT NW LLC (9372). The Debtors' corporate headquarters and service address is 12647 Alcosta Boulevard., Suite 500, San Ramon, California 94583.

*Final Hearing, and (VII) Granting Related Relief* (the "<u>Motion</u>")[2] [D.I. 17] and respectfully represents as follows:

## PRELIMINARY STATEMENT

1. The Committee appreciates the Debtors' need for postpetition financing in these Chapter 11 Cases and the difficulty of obtaining such financing in the current economic climate; however, it cannot support a facility that provides insufficient funding to the estates to allow the Debtors to emerge from Chapter 11 through a confirmable plan.

2. The uncertainty as to when and how relevant markets reopen across the country makes these Chapter 11 Cases more difficult for the Debtors, the Committee, and this Court. Still, the DIP Lenders should not be allowed to strip these estates of all of their unencumbered assets without providing assurances that administrative expenses will be paid in full and unsecured creditors will receive at least the value they would receive if the Debtors' assets were liquidated and they received the proceeds of the unencumbered assets.

3. Importantly, if the DIP Facility is not modified, the DIP Lenders are guaranteed (i) exorbitant fees (including a break-up fee if the Debtors consummate a sale with another party, which they cast as an "Alternate Transaction Payment"), (ii) the benefit of a dollar-for-dollar roll-up of $250 million of existing loans (a portion of which is likely undersecured), and (iii) expanded liens on previously unencumbered assets (including, proceeds on Avoidance Actions, leasehold proceeds, and certain cash deposits), **without having committed to any restructuring support agreement or plan, or any "alternate" transaction that would make a liquidation for these Debtors any less likely**.

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

4.      Moreover, the DIP Facility only provides for $250 million of new money loans, which, upon information and belief, is insufficient to pay the administrative expenses of these Chapter 11 Cases—in particular, due to the Debtors' failure to pay over $90 million of prepetition rent, over $61 million in deferred post-petition rent, and the administrative expense claims of other parties as they accrue or come due in these Chapter 11 Cases.

5.      For these reasons and the reasons stated herein, the Committee proposes the following modifications to the DIP Facility, all as set forth in more detail in this Objection:

- No DIP Liens or Claims on Unencumbered Assets Other than with Respect to New Money: The exorbitant fees already paid to the DIP Lenders and the outsized fees and interest contemplated to be paid over the course of these Chapter 11 Cases constitute more than sufficient consideration for the new liquidity provided by the DIP Lenders. As such, cross-collateralizing the rolled-up amounts with new liens on unencumbered assets and paying the above-market fees is unreasonable and inappropriate. Additionally, it is premature to provide for interest payments on the Roll-Up while the lien investigation of the Committee is ongoing. Doing so would insulate the prepetition claims and liens of the Prepetition Secured Parties from the Committee's Challenge.

- Guarantee of Administrative Solvency: No waivers of the Debtors' section 506(c) surcharge rights, section 552(b) equities of the case exception, and marshaling rights should be granted in these Chapter 11 Cases without first ensuring payment in full to *known* administrative claimants—specifically the approximately $61 million of deferred rent payments—and all other costs and expenses of preserving these estates.

- No Adequate Protection Liens on Unencumbered Assets: No adequate protection by way of replacement liens and claims on previously unencumbered assets (including Avoidance Action proceeds, proceeds of leasehold interests, and certain cash deposits) should be granted to the Prepetition Secured Parties, particularly, in light of the fact that diminution in value has not been established and these assets could be essential sources of recovery for administrative and unsecured creditors.

- No Liens on Avoidance Actions Proceeds: Avoidance Actions and their proceeds are property of the estates created by the Debtors' bankruptcy filing and are typically reserved for unsecured creditors. The DIP Lenders should not receive the extraordinary protection of liens on proceeds of Avoidance Actions where they have not agreed to provide any exit financing or bridge these Chapter 11 Cases to a plan, especially, where the value of Avoidance Actions has not been determined.

- Proposed Fees are Excessive: The proposed Fees (defined below) are unwarranted in light of the DIP Lenders' failure to commit to any restructuring or provide exit financing. The

3

Alternate Transaction Payment is especially problematic, as it constitutes an unnecessary and inappropriate break-up fee, and does not meet the *O'Brien* test.[3]

6. Absent these substantial modifications, the Motion should not be approved. The Committee, despite the Debtors' need of postpetition financing in these Chapter 11 Cases, cannot support a DIP Facility that provides the DIP Lenders all optionality and upside for themselves and provides no downside protection for the Debtors and their administrative and general unsecured creditors.

## BACKGROUND

### I. The Debtors' Chapter 11 Cases

7. On June 15, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors-in-possession. No trustee or examiner has been appointed in these cases.

8. On the Petition Date, the Debtors filed the Motion, seeking interim and final orders (i) authorizing the Debtors to obtain postpetition financing, (ii) authorizing the Debtors to use cash collateral, (iii) granting liens and providing superpriority administrative expense claims, and (iv) granting adequate protection to the Debtors' Prepetition Secured Lenders, among other relief.

9. On June 25, 2020, the United States Trustee for Region 3 appointed the Committee, which consists of the following seven members: (i) Kellermeyer Bergensons Services, LLC; (ii) Precor, Incorporated; (iii) Wells Fargo Bank, National Association, as indenture trustee; (iv) Geneva Crossing Carol Stream IL LLC; (v) SMA Architects, PC; (vi) A.T. Kearney Inc.; and (vii) Brookfield Properties Retail, Inc. *See Notice of Appointment of Committee of Unsecured Creditors*

---

[3] *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) (rejecting the application of a business judgment rule under which a requested termination fee would be approved if the debtor had a good faith believe that the fee would benefit the estate, and instead, finding that "the allowability of break-up fees depends upon the requesting party's ability to show that the fees [a]re actually necessary to preserve the value of the estate."). *See also ¶* 40 of this Objection.

4

[D.I. 284]. On June 26, 2020, the Committee selected Cooley LLP as proposed counsel and Morris James LLP as proposed Delaware counsel. On June 29, 2020, the Committee selected AlixPartners, LLP as its proposed financial advisor.

## II.     The Debtors' Postpetition Financing

10.    As set forth more fully in the Motion, the Debtors' prepetition capital structure includes approximately $1.4 billion in funded debt obligations (the "Obligations"), which may be summarized as follows:

| Debt Instrument | Funded Debt ($ millions) |
|---|---|
| *Prepetition Credit Facility (pari passu)* | |
| Revolving Credit Facility[4] | $95.2 |
| Term Loan Facility | $835.1 |
| **Total Secured Debt** | **$930.3** |
| Senior Unsecured Notes | $500.0 |
| **Total Funded Debt** | **$1,430.3** |

11.    Pursuant to the Motion, the Debtors seek to obtain a $500 million senior, secured postpetition facility (the "DIP Facility") from certain members of the Ad Hoc Group funding the Initial Borrowing (as defined below) (the "Backstop Parties") and any other Eligible Prepetition Lenders (together with the Backstop Parties, the "DIP Lenders").

12.    The DIP Facility consists of (i) a "new money" multiple draw term loan facility in an aggregate principal amount of $250 million (the "New Money DIP Facility") to be provided in two tranches: (a) $50 million within two business days after the entry of the Interim Order (the "Initial Borrowing") and (b) $200 million following the entry of the Final DIP Order (the "Subsequent Borrowing"); and (ii) a roll-up loan facility (the "Roll-Up DIP Facility" or "Roll-

---

[4] This balance excludes obligations outstanding with respect to the issuance of letters of credit totaling approximately $21.4 million under the Prepetition Credit Facility.

Up") pursuant to which the DIP Lenders would be deemed to make loans in an aggregate principal amount equal to $250 million of the Debtors' outstanding obligations under the Prepetition Credit Facility held by the DIP Lenders as of the Petition Date. Under the Roll-Up DIP Facility, the prepetition loans of each DIP Lender are proposed to be rolled up on a dollar-for-dollar basis, subject to entry of the Final DIP Order.

13. In return for providing the DIP financing, the DIP Lenders demand fees and interest totaling $56.6 million in value, representing 22.64% of the new money.[5] The proposed Fees and Payments include the following:

- **To the Backstop Parties:**

    o **6%** "Backstop Commitment Fee" payable in kind; and

    o **4%** "Upfront Equity Investment Right" payable in the form of reorganized common equity issued through a plan of reorganization.

- **To all DIP Lenders:**

    o **3%** "Commitment Fee" payable in cash upon the Initial Borrowing and Subsequent Borrowing, respectively; and

    o **4%** "Alternate Transaction Payment" payable in cash upon the sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or upon conversion to a liquidation under Chapter 7.

The DIP Lenders also seek priming liens and superpriority claims on collateral comprised of essentially all assets of the Debtors, including previously unencumbered assets, such as the Avoidance Actions Proceeds, proceeds of leasehold interests, and certain cash deposits (the "DIP Collateral"). Additionally, the Prepetition Secured Parties seek adequate protection liens and superpriority claims on the DIP Collateral, subject only to the DIP Liens, the Carve-Out, and any valid, binding, enforceable, unavoidable and duly perfected liens that are senior to the DIP Liens.

---

[5] Interest is estimated assuming a six-month case duration, based on the Milestones.

14. Both the DIP Facility and the Debtors' use of Cash Collateral are contingent upon compliance with the Milestones, which include the following expedited deadlines:

| Date | Deadline |
| --- | --- |
| **August 9, 2020** | Debtors shall have entered into a Restructuring Support Agreement |
| **August 14, 2020** | Debtors shall have prepared and filed an Approved Chapter 11 Plan that is acceptable to the DIP Lenders and accompanying Disclosure Statement |
| **October 8, 2020** | The Bankruptcy Court shall have entered an order approving the Disclosure Statement |
| **November 22, 2020** | The Bankruptcy Court shall have entered an order confirming the Approved Chapter 11 Plan |
| **December 12, 2020** | The effective date of an Approved Chapter 11 Plan shall have occurred |

15. On June 17, 2020 the Court entered an order approving the Motion on an interim basis (the "Interim Order") [D.I. 136] and set a final hearing for approval for the DIP Facility on July 14, 2020.

**OBJECTION**

I. **The Proposed Roll-Up Strips the Estates of Valuable Assets, Including Through Payment of an Excessive Interest Rate, and Insulates the Prepetition Liens and Claims of Prepetition Secured Parties from the Committee's Challenge**

16. Roll-ups are not favored because they provide little or no economic benefit to the debtor and solely benefit the prepetition lender by circumventing the Bankruptcy Code's priorities and distribution framework. *See, e.g.*, *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"). Courts will not authorize roll-ups if they materially enhance the prepetition secured creditor's position to the detriment of unsecured creditors. *See, e.g.*, *In re Kaib*, 448 B.R. 373, 376 n.2 (Bankr. W.D. Pa. 2011) (noting that cross-collateralization is generally disallowed in bankruptcy).

7

17. Here, the Roll-Up should not be approved as it serves to improve the position of the Prepetition Secured Parties by elevating $250 million of their prepetition loans—a portion of which is likely *undersecured*—to senior secured status, and inhibits the Committee's investigation rights. The Roll-Up additionally allows the Prepetition Secured parties to obtain liens on previously unencumbered assets and a superpriority administrative claim, while also receiving payment of an excessive above-market interest rate on the Roll-Up. Accordingly, the Committee objects to (i) the granting of new liens on unencumbered assets for anything more than the financing provided under the DIP New Money Facility; (ii) payment of a high and above-market interest rate on the Roll-Up; and (iii) terms of the Roll-Up that impede the Committee's ability to investigate the extent, validity, and enforceability of the rolled-up prepetition claims and liens of the Prepetition Secured Parties, which could lead to payment of interest on prepetition unsecured claims in contravention of the Bankruptcy Code and to the detriment of unsecured creditors.

18. There is no sound business justification for the Roll-Up to be collateralized by previously unencumbered assets when the DIP Lenders are already receiving significant consideration for the financing provided under the DIP New Money Facility in the form of high fees, the payment of expenses, an inflated interest rate, and control over these cases as mandated by the Milestones. Indeed, approval of the cross-collateralization of the Roll-Up would unduly benefit the Prepetition Secured Parties while stripping these estates of valuable assets that should be reserved for the payment of the significant administrative claims accruing in these Chapter 11 Cases, as well as the sizable prepetition rent claims that must be cured in connection with a plan or sale.

19. Importantly, the terms of the Roll-Up insulate the prepetition claims and liens of the Prepetition Secured Parties from the Committee's Challenge because those rolled-up claims and liens will have already been fully converted into postpetition claims with super-priority

administrative expense status, secured by, *inter alia*, previously unencumbered assets of the Debtors. Even though the Motion provides for a lien investigation period, that provision would be effectively a nullity for the portion of the alleged pre-petition obligations rolled up into the Roll-Up DIP Facility. No prepetition liens should be immunized from the Committee's investigation by operation of the DIP Facility's terms concerning the Roll-Up.

20. Additionally, granting interest on the Roll-Up, a portion of which may be undersecured, would impermissibly elevate an unsecured claim not otherwise entitled to interest under the Bankruptcy Code, to "super priority" status entitled to postpetition interest. *See* 11 U.S.C. § 506(b) (providing that the holder of an allowed secured claim that is *oversecured* is entitled to interest) (emphasis added). This is especially important as the proposed interest rates are poised to strip these estates of substantial value.[6] If the Court finds that interest on the Roll-Up is appropriate, in the least such interest should be paid in kind, rather than immediately in cash.

21. To the extent the Bankruptcy Court approves some or all of the proposed Roll-Up, such Roll-Up should not entitle the DIP Lenders to new liens on unencumbered assets or interest on a purportedly out-of-the money prepetition facility.[7] The Roll-Up itself should be subject to the Committee's investigation and Challenge rights, and in the event that the Court determines that the Roll-Up was not fully secured following a successful prosecution of one or more claims against the Prepetition Secured Parties, the Final DIP Order should provide that such portion of the Roll-Up is void and of no effect and that the Prepetition Secured Parties are required to disgorge any

---

[6] Assuming six months in Chapter 11 pursuant to the milestones in the DIP Credit Agreement, the additional cash interest payment would cost the estates an estimated **$12 million**.

[7] Having been formed only recently, the Committee is just beginning to develop its position regarding the value of the assets securing the prepetition claims of the Prepetition Secured Parties. Nonetheless, the Committee is aware based on recent trading prices that the Prepetition Lenders could be significantly undersecured. If that is the case, the Roll-Up itself is improper.

9

principal, interest, fees, or expenses (including adequate protection payments) paid to them on account of the Roll-Up.

## II. The Proposed Waivers of Sections 506(c), 552(b), and Marshaling Rights Are Inappropriate

22. Through the DIP Facility and as set forth in the proposed Final DIP Order, the Debtors propose to waive a number of important rights, including the estates' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, the statutory right to apply the "equities of the case" exception under section 552(b) of the Bankruptcy Code, and the marshaling doctrine. These waivers are inappropriate and harmful to the estates given the uncertain direction of these cases and the potential that administrative claims will not be paid.

### A. The Debtors' 506(c) Rights Must Be Preserved

23. Section 506(c) of the Bankruptcy Code permits a debtor to recover, for the benefit of the estate, the "reasonable, necessary costs and expenses of preserving, or disposing of, [a secured creditor's collateral] to the extent of any benefit" to such creditor. 11 U.S.C. § 506(c). Such expenses include all costs that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984) (citations omitted).

24. Immunizing agreements that prohibit surcharge payment obligations under section 506(c) of the Bankruptcy Code have been found "unenforceable on the basis that such provisions 'would operate as a windfall to the secured creditor at the expense of administrative claimants.'" *Hartford Fire Ins. Co. v. Norwest Bank Minn., N.A. (In re Lockwood Corp.)*, 223 B.R. 170, 176 (8th Cir. BAP 1998) (citation omitted); *see also Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Idus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (stating "section 506(c) is designed to prevent a windfall to the secured creditor"). Such waivers, which are binding upon all parties in

interest, should never be lightly granted and the debtor should never concede this issue but for a compelling reason. *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 12 (2000) (holding that a debtor's decision to waive section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require").

25. In this district in particular, courts often refuse to enforce waivers of section 506(c) surcharge rights when a creditors' committee objects to the waiver. *See, e.g.*, Hr'g Tr. at 20-21, *In re Mortg. Lenders Network USA, Inc.*, No. 07-10146 (PJW) (Bankr. D. Del. Mar. 27, 2007), [D.I. 346] ("Well, let me tell you what the law in this Court's been for at least the last five years. If the Committee doesn't agree with the waiver, it doesn't happen."); *see also* Final Order Authorizing Debtors to Obtain Postpetition Financing [D.I. 244] & Hr'g Tr. at 120:15-19, *In re Motor Coach Indus. Int'l, Inc.*, No. 08-12136 (BLS) (Bankr. D. Del. Oct. 17, 2008), [D.I. 282] (court declined to approve section 506(c) waiver over committee objection, stating "I cannot recall a case . . . where I have approved this kind of relief, that being liens on avoidance actions and a 506(c) waiver, over a committee objection"); Hr'g Tr. at 212:12-22, *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 5, 2014), [D.I. 3927] (declining to approve a 506(c) waiver over objection "based primarily . . . on the fact that it's not fully consensual" and stating that "Judge Walsh once told me that he'd never approve a 506(c) waiver on a non-consensual basis").[8]

---

[8] *See also, e.g.*, Final Order Authorizing Debtors to Obtain Postpetition Financing [D.I. 272] & Hr'g Tr. at 87:15-18, *In re Feders N. Am., Inc.*, No. 07-11176 (BLS) (Bankr. D. Del. Oct. 10, 2007), [D.I. 278], (declining to approve final debtor-in-possession financing order containing section 506(c) waiver over committee objection and finding that "at this stage of a case without any understanding or confidence about where this process ultimately will play out, I believe it is inappropriate to impose upon the creditors of this estate a waiver of any rights under section 506(c)"); Hr'g Tr. at 26:4-6, *In re Cooper Standard Holdings, Inc*., No. 09-12743 (PJW) (Bankr. D. Del. Aug. 5, 2009), [D.I. 79] ("[I]f the Committee objects to the 506(c) waiver, I'm going to sustain their objection.").

26. In the present case, the Debtors have sought to defer no less than $61 million in postpetition rent, creating an enormous administrative expense claim for these estates. The Debtors have additionally incurred significant prepetition rent claims and are continuing to incur postpetition obligations to various trade vendors and other claimants. There is no guarantee that these amounts will be paid based on the structure of the DIP Facility, the uncertainty over member attrition rates caused by the pandemic, and the failure of the DIP Lenders to commit the necessary funding to ensure the administrative solvency of these estates, as well as a successful exit from Chapter 11. Absent the Debtors' retention of their rights under section 506(c), the estates may be without recourse to recoup the necessary expenses incurred to enhance and improve secured creditor returns. The Debtors' estates should not lose their rights under section 506(c).[9]

### B.    Waiver of the 552(b) Equities of the Case Exception Is Inappropriate

27. Section 552(b) of the Bankruptcy Code allows a court to refuse, based on the equities of a case, to extend a prepetition lien to postpetition "proceeds, products, offspring or profits" of prepetition collateral. 11 U.S.C. § 552(b)(1). "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustees/debtor-in-possessions use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value." *In re Muma Servs.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) (citation omitted). *See also Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc. (In re Photo Promotion Assocs., Inc.)*, 61 B.R. 936, 939 (Bankr. S.D.N.Y. 2000).

---

[9] To the extent a 506(c) waiver is granted, the Final DIP Order should provide that the Prepetition Secured Parties are consenting to a surcharge for the costs and expenses provided for in the Budget and that the 506(c) waiver shall not limit the Court's ability to conclude that costs and expenses that would otherwise be surchargeable under section 506(c) do not constitute diminution in value. Moreover, before any waiver of the Debtors' section 506(c) rights is granted, the Debtors must be required to escrow amounts outstanding that constitute deferred postpetition rent.

28. For the same reasons that a 506(c) waiver is inappropriate, the Debtors should not be permitted to waive their rights under section 552(b) given the uncertainty that the administrative expenses of these cases will be paid.

### C. The Estates' Marshaling Rights Should Not Be Waived

29. Marshaling requires a "senior secured creditor to first collect its debt against the collateral other than that in which the junior secured creditor holds an interest, thereby leaving that collateral for the junior secured creditor's benefit." *Simon & Schuster, Inc. v. Advanced Mktg. Servs., Inc. (In re Advanced Marketing Servs., Inc.)*, 360 B.R. 421, 427 n.8 (Bankr. D. Del. 2007). Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237 (1963). Marshaling can be pursued by the Committee for the benefit of unsecured creditors. *See, e.g.*, *Official Comm. of Unsecured Creditors of America's Hobby Ctr., Inc. v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 287 (Bankr. S.D.N.Y. 1998) ("Because a debtor in possession has all the rights and powers of a trustee . . . [the Committee] standing in the shoes of the debtor in possession . . . can assert this [marshaling] claim.").

30. The Court should reject any limit to the marshaling doctrine, and the Prepetition Secured Parties should be required to first look to encumbered Collateral, either in connection with a full chain liquidation or in connection with the allocation of value amongst assets in connection with the consideration of a plan of reorganization. The Prepetition Secured Parties have liens on a diverse pool of assets, and at this early stage in the Chapter 11 Cases, there is no basis to waive the marshaling doctrine. Marshaling would require the DIP Lenders and the Prepetition Secured Parties to recover their prepetition collateral first to maximize recoveries to all constituents, including junior creditors. As set forth above, at a minimum, the Court should require the DIP Lenders and Prepetition Secured Parties to satisfy their claims or adequate protection claims, if

any, from the proceeds of assets subject to prepetition liens before they can look to the proceeds of assets upon which they did not possess a security interest as of the Petition Date.

### III. The DIP Facility Improperly Grants to the DIP Lenders Liens on Potentially Valuable Unencumbered Estate Property and Provides an Excessive Adequate Protection Package to the Prepetition Secured Parties

31. The Debtors propose to grant the DIP Lenders priming liens and superpriority claims on the DIP Collateral, including on previously unencumbered assets, such as proceeds of Avoidance Actions, proceeds of leasehold interests, and certain cash deposits. The Debtors also propose to grant adequate protection to the Prepetition Secured Parties in the form of adequate protection liens and superpriority claims on the DIP Collateral, subject only to the DIP Liens, the Carve-Out, and any valid, binding, enforceable, unavoidable and duly perfected liens that are senior to the DIP liens.

32. If approved, such liens and claims will have a drastic negative impact on general unsecured creditors, depriving them of potentially their only sources of recovery, especially in the event these Chapter 11 Cases transition to a liquidation.

#### A. The Prepetition Secured Parties and DIP Lenders Should Not Be Granted Liens and Superpriority Claims with Respect to Avoidance Actions

33. Avoidance actions are distinct creatures of bankruptcy law designed to benefit and ensure equality of distribution among general unsecured creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Copr. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000), *rev'd en banc*, 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for the estate's benefit); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries."). *See also Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm L.P. IV*, 229 F.3d 245, 250 (3d Cir. 2000) (stating that "any recovery [under

avoidance powers] is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer").

34. The Debtors have not provided any justification for the extraordinary granting of liens on Avoidance Action proceeds, or for the potential payment of superpriority claims with the proceeds of such actions. Excluding the Avoidance Actions proceeds from the Adequate Protection Liens is especially critical here, as such proceeds may constitute the only source of meaningful recovery available to the Debtors' unsecured creditors. Accordingly, the Committee objects to the DIP Lenders and Prepetition Secured Parties receiving liens on and superpriority claims with recourse to the proceeds of the Avoidance Actions.

### B. The Requested Adequate Protection for the Prepetition Secured Lenders is Unwarranted

35. The purpose of adequate protection "is to [e]nsure that the creditor receives the value for which [he] bargained prebankruptcy." *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987). Adequate protection is, therefore, a protection for the creditor to assure its collateral is not depreciating or diminishing in value and is made on a case-by-case basis. *Id.* at 1397; *see also United Savings Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988) (explaining that an "interest is not adequately protected if the security is depreciating during the term of the stay"). For these reasons, "[t]he secured creditor 'must, therefore, prove this decline in value—or the threat of a decline—in order to establish a prima facie case.'" *In re Gunnison Ctr. Apts., LP*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) (quoting *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994)); *Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear)*, 193 B.R. 713, 718 (Bankr. D. Del. 1996) ("[The secured creditor] has the initial burden in proving a prima facie case of cause, which if proved, must be rebutted by [the debtor] if the stay is not to be lifted.").

36. Secured creditors are only entitled to adequate protection to the extent of the anticipated or actual decrease in value of the secured collateral during the bankruptcy case. *See In re Energy Future Holdings Corp.*, 546 B.R. 566, 581 (Bankr. D. Del. 2016) ("The purpose of adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor.") (citation omitted); *In re Mary Holder Agency, Inc.*, No. 11-34280 (MBK), 2012 Bankr. LEXIS 4452, at *1 (Bankr. D.N.J. Sep. 24, 2012); *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584-85 (Bankr. D. Col. 1995). A corollary to that rule is that "the adequate protection provided must not substantially exceed that to which the secured creditor is entitled." *Travelers Ins. Co. v. Am. AgCredit Corp. (In re Blehm Land & Castle Co.)*, 859 F.2d 137 (10th Cir. 1988). It is well-settled that adequate protection is not to be granted absent a showing of diminution in value. *In re Continental Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("Post-*Timbers* courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral."); *Barclays Bank of N.Y., N.A. v. Saypol (In re Saypol)*, 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983) ("In the context of the automatic stay, Congress believed the existence *vel non* of such a decline [in the value of the secured creditor's interest] to be almost decisive in determining the need for adequate protection.").

37. The Prepetition Secured Parties have not offered any proof of actual or threatened diminution in the value of their collateral. As such, the Prepetition Secured Parties have not met their *prima facie* case, and the grant of adequate protection should be denied. *See In re Gunnison Ctr. Apts., LP*, 320 B.R. 391 at 396; *In re Blehm Land & Castle Co.*, 859 F.2d at 141 ("[A]dequate protection provided must not substantially exceed that to which the secured creditor is entitled."). Moreover, to the extent the Prepetition Secured Parties are priming their own liens, they cannot

claim that their rights are being impermissibly modified, and therefore, should not be entitled to additional, unnecessary security that will come at the direct expense of unsecured creditors.

38. Thus, the Committee respectfully submits that the Final DIP Order should specify that the Prepetition Secured Lenders are entitled to adequate protection liens on unencumbered assets solely to the extent that they are able to prove actual diminution in the value of their collateral, and in the event the Court determines that granting Adequate Protection Liens on previously unencumbered assets is appropriate, the Final DIP Order should require the Prepetition Secured Parties to seek recoveries from all other collateral before they can seek recourse from any previously unencumbered assets.

39. In addition, the Committee requests that the Final DIP Order be modified to make clear that all amounts paid as adequate protection are subject to re-characterization (as payments of principal of the outstanding prepetition claims of the Prepetition Secured Parties) or disgorgement, as applicable, in the event the Prepetition Secured Parties are determined to be undersecured or unsecured.

**IV.  The Proposed Commitment Fees and Alternate Transaction Payment Payable in Cash Are Excessive and Inappropriate**

40. The proposed $15 million Backstop Commitment Fee, $7 million DIP Commitment Fee, and $10 million Alternate Transaction Payment (together, the "Fees") on the DIP New Money Facility are plainly excessive. In addition, the Alternate Transaction Payment, which is more akin to a break-up fee, is inappropriate, as it requires the Debtors to make the payment even if the DIP Lenders refuse to support the Debtors' restructuring or provide exit financing. In this Circuit, breakup fees are payable "only to the extent that they constitute the actual, necessary costs and expenses of preserving the estate." *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018) (citing *In re O'Brien Envitl. Energy, Inc.*, 181 F.3d at 532 (3d Cir. 1999)). The Alternate Transaction Payment does neither, and instead, allows the DIP Lenders to control the course of

the Debtors' restructuring and receive a $10 million windfall even where all going concern value is lost. Consequently, the proposed Final Order should be modified to eliminate this free gift to the DIP Lenders.

### V.     Additional Issues with the DIP Facility and Final DIP Order

41.     In addition to the foregoing, the Committee has the following objections to the Final DIP Order:

- The budget variances and covenants must be flexible and appropriately tailored to the unusual circumstances of these Chapter 11 Cases. The 20% permitted variance with respect to receipts should be eliminated—if the COVID-19 pandemic continues on its current course, forcing the Debtors' locations to shut down, the Debtors will undoubtedly be unable to meet this requirement.

- The proposed releases of the Prepetition Secured Parties are overbroad and all claims other than as to the validity, perfection, and priority of their liens should not be subject to the Challenge Deadline.

- The proposed $50,000 budget to investigate the validity, perfection, and priority of the Prepetition Secured Parties' liens is inadequate. To the extent the Court decides to impose any investigation cap, the Committee respectfully submits that the Committee's investigation budget should be increased to $100,000 to ensure the Committee is able to discharge its statutory mandate. The Committee further requests that it be allowed to use any portion of the investigation budget to prosecute or challenge the validity, enforceability, perfection, priority, or extent of the liens asserted by the DIP Lenders.

- No Fees should accrue on the $30 million of cash and cash equivalents that the Debtors are restricted from using.

- The Final DIP Order should make clear that the Committee has the same rights as the Debtors with respect to the Debtor Reserved Claims.

- The Final DIP Order should make clear no party can raise as a defense to any Challenge, adversary proceeding, or contested matter brought by the Committee or any other creditors derivatively on behalf of any of the Debtors that are LLCs, the inability of the Committee or any other creditors to file derivative suits on behalf of the LLC Debtors solely because the LLC Debtors have waived fiduciary duties under section 18-1101 of the Delaware Limited Liability Act.

## **RESERVATION OF RIGHTS**

42. This Objection is submitted without prejudice to, and with a full reservation of, the Committee's rights to supplement and amend this Objection, including the filing of a declaration in support thereof, to introduce evidence at any hearing relating to this Objection, and to further object to the Motion, on any grounds that may be appropriate. The Objection is also without prejudice to the Committee's right to seek other appropriate relief, including reconsideration of the relief granted in the Interim Order.

[*Remainder of page intentionally left blank*]

**WHEREFORE**, the Committee respectfully requests that the Court not grant the Motion without the modifications proposed herein, and enter such other and further relief as the Court deems just and proper.

Dated: July 10, 2020

*/s/ Brya M. Keilson*
Eric J. Monzo (DE Bar No. 5214)
Brya M. Keilson (DE Bar No. 4643)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
Email: emonzo@morrisjames.com
          bkeilson@morrisjames.com

-and-

Cathy Hershcopf
Michael Klein
Lauren A. Reichardt
**COOLEY LLP**
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275
Email: chershcopf@cooley.com
          mklein@cooley.com
          lreichardt@cooley.com

-and-

Cullen D. Speckhart
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle
*Admitted to practice in Virginia*
*Not admitted to practice in DC, supervised by members of DC bar*
**COOLEY LLP**
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 842-7800
Fax: (202) 842-7899
Email: cspeckhart@cooley.com
          oantle@cooley.com
*Proposed Counsel for the Official Committee of Unsecured Creditors of 24 Hour Fitness Worldwide, Inc., et al.*